## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK MILLER<br>3810 Vair Street<br>Durham, NC 27703,<br>INDIVIDUALLY AND ON BEHALF OF ALL<br>OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>INPHONIC, INC.<br>1010 Wisconsin Ave., Suite 600<br>Washington D.C. 20007,<br><br>DAVID A. STEINBERG<br>1010 Wisconsin Ave., Suite 600<br>Washington D.C. 20007,<br><br>- and -<br><br>LAWRENCE S. WINKLER<br>1010 Wisconsin Ave., Suite 600<br>Washington DC 20007<br><br>Defendants. | **CIVIL ACTION NO. _____**<br><br>**CLASS ACTION COMPLAINT<br>FOR VIOLATIONS OF THE<br>FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Mark Miller, individually and on behalf of all other persons similarly situated, by his

undersigned attorneys, for his complaint against Defendants, alleges the following based upon

personal knowledge as to himself and his own acts, and information and belief as to all other matters,

based upon, *inter alia*, the investigation conducted by and through his attorneys, which included,

among other things, a review of the Defendants' public documents, conference calls and

1

announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Inphonic, Inc. ("Inphonic", or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the common stock of Inphonic from August 2, 2006 through May 3, 2007, inclusive (the "Class Period") seeking to recover damages caused by Defendants' violations of federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

2

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff Mark Miller, as set forth in the accompanying certification, incorporated by reference herein, purchased Inphonic securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Inphonic is a District of Columbia corporation with its principal executive offices located at 1010 Wisconsin Avenue, Suite 600, Washington DC 20007. Inphonic through its subsidiaries, is an online seller of wireless services in the United States.  It operates in three segments, wireless activation and services, mobile virtual network enabler services, and data services. During the Class Period the Company's stock traded on NASDAQ under ticker "INPC".

8.     Defendant David A. Steinberg ("Steinberg") is the Company's founder and at all relevant times herein served as the Company's Chairman and CEO.  Steinberg serves as trustee of a trust that is a limited partner of Technology Crossover Ventures V, L.P..  The Company's former director Jay C. Hoag is a member of Technology Crossover Management V, L.L.C., which serves as the General Partner of Technology Crossover Ventures, V. L.P.

9.     Defendant Lawrence S. Winkler ("Winkler") at all relevant times herein served as the Company's CFO.

10.     Steinberg and Winkler are collectively referred to hereinafter as the "Individual Defendants."

11.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Inphonic and its subsidiaries and affiliates, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     Because of the Individual Defendants' positions within the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers and directors of Inphonic and its subsidiaries and affiliates, by virtue of their positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations

of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14. As officers, directors and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Inphonic, each of the Individual Defendants had access to the adverse undisclosed information about Inphonic's financial

condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Inphonic and its business issued or adopted by the Company materially false and misleading.

16.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the representations contained therein.

17.     Each of the Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Inphonic securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding Inphonic's business, operations, management and the intrinsic value of Inphonic securities; and (ii) caused Plaintiff and other members of the Class to purchase Inphonic securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased shares of Inphonic during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Inphonic's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by Inphonic or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Inphonic;

(c) whether Defendants acted knowingly or recklessly in making materially false and misleading representations or omitting to state material facts during the Class Period;

(d) whether the market prices of the Company's securities were artificially inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

23. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

24. During the Class Period, Inphonic issued materially false and misleading statements about its earnings and revenues, filed materially false and misleading financial statements with the SEC, violated provisions of Generally Accepted Accounting Principles ("GAAP"), maintained inadequate internal controls, and violated the Company's own accounting procedures and historical practices that caused the Company's stock price to decline. In particular, the Company improperly recognized revenues in connection with customer contracts that were cancelled in situations where the wireless devices provided under contract were not returned pursuant to the terms of the customer contracts ("EDPs"). Additionally, the Company improperly recognized net activation and service revenues as a change in its estimate of the collectibility of certain disputed carrier commissions. The

cumulative effect of these errors resulted in the Company materially under-reporting its net losses for

FY 2006 by nearly 100%.

25.    The Class Period begins on August 2, 2006 when the Company issued a materially

false and misleading press release announcing its Q2 ended June 30, 2006 results. The press release

states in relevant part:

> WASHINGTON, August 2, 2006 (BUSINESS WIRE) — InPhonic, Inc. (NASDAQ:INPC), a leading online seller of wireless services and products, today reported financial results for second quarter ended June 30, 2006.
>
> Revenue was $95.8 million for the second quarter 2006, compared to $75.2 million for the second quarter 2005. Loss from continuing operations for the second quarter 2006 was ($5.1) million or ($0.14) per basic and diluted share compared to a loss from continuing operations of ($1.2) million for the second quarter of 2005 or ($0.04) per basic and diluted share. Excluding the impact of restructuring costs and acquisition earn out expenses, loss from continuing operations would have been ($2.5) million or ($0.07) per basic and diluted share.
>
> *       *       *       *
>
> "We are pleased with the financial and operational results for the first half of the year." InPhonic CEO David A. Steinberg commented, "Our new management additions; Andy Zeinfeld, President of E-commerce, and Brian Curran, Chief Operating Officer, and the existing team continue to impact their respective areas and we expect the combined efforts of InPhonic's expanded management team will have positive contributions to our financial and operational results over the second half of 2006."
>
> Mr. Steinberg added, "We continued our migration to a recurring residual-based compensation model with the signing of two new distribution agreements and continue to believe that additional residual agreements may be completed before year end. Because the two new agreements are incremental to our business, there will be no impact to planned point-of-sales revenue. By quarter end, we had approximately 336,000 residual subscribers, more than double the 161,000 residual subscribers at the end of the first quarter of 2006. A growing residual income stream would improve our operating margins over time and provide better visibility into future financial results."

26.    On August 9, 2006 the Company filed its Q2 report with the SEC on Form 10-Q that

reiterated the materially false and misleading information contained in the August 2, 2006 press

release. Steinberg and Winkler signed the 10-Q and certified them pursuant to Sections 302 & 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

27.     On November 6, 2006 the Company issued a materially false and misleading press release announcing its Q3 ended September 30, 2006 results. The press release states in relevant part:

> InPhonic Announces Financial Results for Third Quarter 2006
>
> $13.8 Million in Quarterly Positive Operating Cash Flow Signed Residual Compensation Agreement with Fourth Major Wireless Carrier
>
> WASHINGTON, November 6, 2006 (BUSINESS WIRE) — InPhonic, Inc. (NASDAQ:INPC), a leading online seller of wireless services and products, today reported financial results for the third quarter ended September 30, 2006. Additionally, InPhonic has reached a settlement in principle with the District of Columbia Attorney General.
>
> Revenue was $102.2 million for the third quarter 2006, compared to $92.0 million for the third quarter 2005. Loss from continuing operations for the third quarter 2006 was ($4.9) million or ($0.13) per basic and diluted share compared to a loss from continuing operations of ($4.4) million for the third quarter of 2005 or ($0.12) per basic and diluted share. Excluding the impact District of Columbia Attorney General Settlement and related expenses of $3.8 million, loss from continuing operations would have been ($1.0) million or ($0.03) per basic and diluted share.
>
> Cash provided from operating activities was $13.8 million for the third quarter 2006, compared to a loss of ($6.3) million for third quarter 2005. Cash provided from operating activities was $6.0 million for the first nine months of 2006, compared to a loss of ($15.6) million for the first nine months of 2005. Cash and cash equivalents totaled $57.5 million at September 30, 2006.
>
> *       *       *       *
>
> "We are pleased with our progress in transitioning an increasing amount of InPhonic's business to a residual revenue model characterized by a predictable, high margin and transparent recurring revenue stream." InPhonic CEO David A. Steinberg commented, "Efforts to improve operational efficiency and our disciplined focus on sustainable growth delivered significant improvements in operating cash flow, solid revenue growth and continued margin expansion in the quarter."

28.     On November 9, 2006 the Company filed its Q3 report with the SEC on Form 10-Q that reiterated the materially false and misleading information contained in the November 6, 2006 press release. Steinberg and Winkler each signed the 10-Q and certified it pursuant to Sections 302 & 906 of SOX.

29.     On or about November 9, 2006, the Company announced on Form 8-K, that Steinberg and Winkler sold 450,000 and 100,000 shares of the Company stock, respectively, in connection with a financing transaction.

30.     On November 13, 2006 a Form 4 was filed by former (effective October 13, 2006) Company director and audit committee member Jay C. Hoag ("Hoag") on behalf of Technology Crossover Ventures ("TCV"). The Form 4 reveals that various limited partnership under the control of TCV or to which TCV had a pecuniary interest sold a significant percentage of their holdings or 2 million shares of the Company stock.

31.     On November 15, 2006 the Company issued a press release announcing a $30 million stock buyback approved by the Board.

32.     On November 15, 2006 Hoag filed another Form 4 with the SEC on behalf of TCV. The Form 4 reveals that various limited partnerships under the control of TCV or to which TCV had a pecuniary interest in sold a significant percentage of their holdings or 756,000 shares of the Company stock.

33.     On or about December 28, 2006 the Company's board granted restricted stock awards to Steinberg and Winkler in the amount of 500,000 shares and 100,000 shares, respectively.

11

34.    According to a Form 4 filed with the SEC, on January 7, 2006 Winkler sold 100,000 shares of the Company stock or almost a quarter of the stock he directly held of the Company at the time.

35.    On February 22, 2007 the Company issued a materially false and misleading press release announcing its Q4 ended December 31, 2006 and FY 2006 results. The press release states in relevant part:

InPhonic Announces Financial Results for Fourth Quarter and Full Year 2006

*Reports Record Fourth Quarter and Full Year 2006 Results Signs Fifth Major Wireless Carrier to Residual Compensation Agreement Reaches Final Settlement with Attorney General's Office*

WASHINGTON, February 22, 2007 (BUSINESS WIRE) — InPhonic, Inc. (NASDAQ:INPC), a leading online seller of wireless services and products, today reported financial results for the fourth quarter and full year ended December 31, 2006.

"We are very pleased with our fourth quarter and full year results. In 2006, InPhonic made substantial progress in transitioning our business by putting in place residual-based compensation agreements with most of the major wireless carriers, improving our customer service experience, expanding our industry leading online distribution channel with high-quality partners such as Best Buy, Staples and Amazon," said InPhonic's Chairman and CEO David A. Steinberg. "For 2007, we are focused on continuing the strong operational momentum of this past year while maintaining strong revenue growth, further improving operating and contribution margins and generating sustainable positive operating cash flow."

Revenue was $120.3 million for the fourth quarter 2006, compared to $85.2 million for the fourth quarter 2005. Loss from continuing operations for the fourth quarter 2006 was ($3.4) million or ($0.09) per basic and diluted share compared to a loss from continuing operations of ($24.8) million for the fourth quarter of 2005 or ($0.70) per basic and diluted share. Excluding the impact of rebate settlement and related expenses and restructuring costs of $4.5 million, income from continuing operations for the fourth quarter 2006 would have been $1.1 million or $0.03 per basic and diluted share.

*         *         *         *

Revenue was $405.7 million for the year ended December 31, 2006, compared to $320.5 million for the year ended December 31, 2005. Loss from continuing operations for the year ended December 31, 2006 was ($17.3) million or ($0.48) per basic and diluted share compared to a loss from continuing operations of ($37.8) million for the year ended

12

December 31, 2005 or ($1.10) per basic and diluted share. Excluding the impact of rebate settlement and related expenses, settlement and earnout expenses and restructuring costs of $11.1 million, loss from continuing operations for the full year of 2006 would have been ($6.2) million or ($0.17) per basic and diluted share.

*        *        *        *

During the fourth quarter of 2006, InPhonic generated positive cash flow of approximately $6.5 million from its operations. The company also had changes in working capital reflecting purchases of inventory for the holiday selling season which utilized prompt pay discounts from its suppliers. We also experienced heavy activation volumes in the latter half of the fourth quarter, due to the holiday selling season, which increased accounts receivable that have subsequently converted to cash in the first quarter of 2007.

### Fifth Major Wireless Carrier Signs Up For Residual Compensation

InPhonic recently signed an agreement with another major wireless carrier that provides for monthly residual commission payments. This represents the fifth major wireless carrier to enter into a residual compensation agreement with InPhonic. In addition, InPhonic has residual compensation agreements with two MVNO partners, Virgin Wireless and Amp'd Mobile. "We continue to be successful in negotiating residual based compensation over the life of a subscriber in exchange for a reasonable concession in near-term activation revenue," commented InPhonic CFO Larry Winkler. "We are very pleased with the economics of these residual compensation agreements and believe they are providing increased visibility and value to the business."

InPhonic ended 2006 with approximately 660,000 residual revenue subscribers.

## THE TRUTH BEGINS TO EMERGE

36.     On April 3, 2007 the Company shocked the market when it announced on Form 8-K filed with the SEC that, among other things, its Q2, Q3, Q4 2006 and FY 2006 results should no longer be relied upon. According to the SEC website this Form 8-K is dated April 2, 2007, but was not available publicly until sometime after the market closed on April 2, 2007 The 8-K states in relevant part:

> Item 4.02. Non-Reliance On Previously Issued Financial Statements Or A Related Audit Report Or Completed Interim Review.
>
> On April 2, 2007, the Company's management and Audit Committee concluded that the Company's unaudited financial statements for the quarterly periods ended June 30, 2006 and

13

September 30, 2006 each as filed on Form 10-Q (the "2nd and 3rd Quarter Financials") as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007 (the "Year End Results") should no longer be relied upon as a result of certain errors discovered subsequent to the issuance of the Year End Results. At this time the Company has identified the matters set forth below which will require changes to the 2nd and 3rd Quarter Financials and unaudited Year End Results. Certain additional matters are also subject to review. The matters for which changes will be required are:

In 2006, the Company recorded net activation and services revenue as a change in its estimate of certain disputed carrier commissions which it had deemed collectible. The Company now believes that it was inappropriate to have recorded revenue associated with this matter until such collections are received. If the Company is ultimately able to collect any of these disputed carrier commissions, the amount would be recorded as revenue at the time of collection. We have subsequently collected some of these receivables and recorded them as revenue.

The Company has also identified a deficiency in its process for recording certain fees due from consumers when contracts are canceled within specified time periods and the wireless device is not returned to the Company as is required under the contract with the customer ("EDPs"). The Company believes that revenue originally recorded as being earned under generally accepted accounting principles and the related accounts receivable amount should be reduced to be reflective of such historical experience. If the Company ultimately is able to collect on or sell these pools of consumer receivables at a more favorable rate, a gain may be recorded at the time of such collection or sale, subject to the terms of the agreements. The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

The Company expects to amend the previously filed Form 10-Qs for the 2nd and 3rd Quarter Financials with an aggregate impact of a reduction of revenue for the quarterly periods ended June 30, 2006 and September 30, 2006. The Company also anticipates revising the Year End Results. The amendments to the prior period financial statements, including for our year-end results, for the above and certain other entries are one-time, non-cash charges that the Company expects will increase its previously reported net loss for 2006 by a range from approximately $5 million to $7 million in the aggregate. The foregoing is an estimate subject to change until the Company's accounting review and outside audit is complete. The reduction in revenue will have corresponding impacts to previously reported quarterly revenue and will result in increased net losses for each period.

Additionally, the Company has identified three material weaknesses in its internal controls over financial reporting. At the entity level, management identified a material weakness in its control environment because it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups. At the transactional level, due to the lack of sufficient personnel, the Company was unable to properly perform certain accounting

14

procedures in a timely manner relating to the recording of carrier commissions. Also, at the transactional level, the Company identified a material weakness in its process for recording revenue relating to EDPs. The Company will be required to provide an assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting when it files its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has already taken action to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition, however, our efforts to remediate deficiencies surrounding the levels of our staffing may take some time to remediate over the next several quarters.

The Company intends to file its restated financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 together with its Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

37.    The announcement shocked the market and the Company's stock fell $1.21 per share or 11.7% on extremely heavy volume.

38.    On May 4, 2007 the Company filed a Form 8-K/A with the SEC announcing additional details about the forthcoming restatement. The Company announced that the restatement would have a "greater impact" than reported in the Company's April 3, 2007 announcement. The Company also identified additional material errors. The Form 8-K/A states in relevant part:

The following includes an update of the information first disclosed in the Company's Form 8-K dated April 2, 2007.

The Company's Audit Committee has conducted additional review using the services of independent counsel and other experts with respect to the matters identified below. It is the conclusion of the Audit Committee that these matters resulted from misapplication of GAAP; improperly recognized revenue and improperly deferred expenses; inadequate controls and insufficient processes, procedures and expertise. In response, the Company is currently developing and implementing a remediation plan, which will include a reorganization of the finance and accounting functions within the Company.

Fiscal Year 2006

On April 2, 2007, the Company's management and Audit Committee concluded that the Company's unaudited financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 each as filed on Form 10-Q (the "2nd and 3rd Quarter Financials") as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007 (the "Year End

15

Results") should no longer be relied upon as a result of certain errors discovered subsequent to the issuance of the Year End Results. At this time the Company has identified the matters set forth below which will require changes to the 2nd and 3rd Quarter Financials and unaudited Year End Results. Certain additional matters are also subject to an ongoing review. The matters for which changes will be required are:

- In 2006, the Company recorded net activation and services revenue of approximately $16 million related to certain carrier commissions and bonuses which it had deemed collectible. The Company now believes that it was inappropriate to have recorded revenue associated with these matters until such collections are received. The Company will continue its efforts to collect amounts outstanding and will record related receipts as revenue at the time of collection.

- The Company has identified a deficiency in its process for recording certain fees due from consumers when contracts are canceled within specified time periods or the wireless device is not returned to the Company as is required under the contract with the customer ("Equipment Discount Provisions" or "EDPs"). The Company believes that $2.5 million in revenue originally recorded as being earned and the related accounts receivable amount should be reduced to be reflective of such historical experience without regard to improvements in collections expected in the future from additional collection processes being employed. If the Company ultimately is able to collect on or sell these pools of consumer receivables at a more favorable rate, a gain may be recorded at the time of such collection or sale, subject to the terms of the agreements. The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

- The Company has identified an error in the recording of accrued expenses and reserves for consumer product rebates totaling $4.9 million. These amounts should have been recorded as either an expense or reduction to equipment revenue in 2006. The Company believes that $3.3 million of the total adjustment is related to additional expenses for rebates paid to consumers as "goodwill" prior to its settlement with the Attorney General of the District of Columbia.

- The Company has identified other accounting adjustments of approximately $3 million, net, related to the correction of certain equipment expenses, sales and marketing expenses, and general and administrative expenses associated with accruals of professional fees, unbilled inventory, the write-off of certain assets on the balance sheet, and other adjustments.

The Company expects to amend the previously filed Form 10-Qs for the 2nd and 3rd Quarter Financials and the Year End Results with an aggregate impact greater than anticipated at the time of the Company's original April 2, 2007 Form 8-K filing. The Company currently expects that it will increase its previously reported net loss to reflect an aggregate net loss of

approximately $43 million to $49 million for the year. A portion of these adjustments should be mitigated by dollars that have already been reserved. The foregoing continues to be an estimate and is subject to change until the Company's outside audit is complete. In addition, given the adjustments and errors identified to date as described above and the ongoing audit of 2006, the Company's management and Audit Committee have concluded that the unaudited financial statements for the quarter ended March 31, 2006 should no longer be relied upon. At the present time, no matters have come to the Company's attention that would result in a restatement of the March 31, 2006 financial statements. The Company expects to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 within two to three weeks. The Company will file its restated financial statements for the quarterly periods ended June 30, 2006, and September 30, 2006, as well as its Form 10-Q for the first quarter of 2007 together with the filing of the Annual Report on Form 10-K.

Additionally, the Company has identified six material weaknesses in its internal controls over financial reporting. At the entity level, management identified a material weakness in its control environment because it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups. At the transactional level, due to the lack of sufficient personnel, the Company was unable to properly perform certain accounting procedures in a timely manner relating to the recording of carrier commissions. Additionally, the Company inappropriately recorded receivables from the carriers that were not supported by historical experience. Also, the Company identified a material weakness in its process for recording revenue relating to EDPs as well as a material weakness due to a failure within the Company to effectively communicate information to its finance department necessary to record certain marketing expenses on a timely basis. Finally, the Company did not utilize an appropriate methodology for recording consumer product rebates. The Company will be required to provide an assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting when it files its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has already taken some action to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition, however, our efforts to remediate deficiencies surrounding the levels of our staffing and related levels of expertise may take some time to remediate over the next several quarters.

Fiscal Year 2005

In addition to the 2006 issues discussed above, the Company has identified an error regarding a marketing expense of approximately $1.2 million that should have been recorded in the quarter and year ended December 31, 2005. Of such amount, $600,000 was recorded in the quarter ended December 31, 2006. If it had been properly recorded, such additional expense would have increased the Company's net loss for the quarter ended December 31, 2005 from approximately $24.8 million to approximately $26.0 million. As a result of this new disclosure, on May 1, 2007, the Company's management and Audit Committee concluded

that the Company's audited financial statements for the fiscal year ended December 31, 2005 should no longer be relied upon. The Company and the Audit Committee are continuing their review and have not yet determined whether a restatement of financial results for the year ended December 31, 2005 will be required. As a result of its review the Company may discover additional errors to its previously filed financial statements.

39.    According to the SEC website, this Form 8-K/A was "accepted" for filing by the Commission on May 3, 2007. During trading on May 3, 2007, the Company stock opened at $9.34 per share, throughout most of the morning and early afternoon the Company's stock traded in a narrow range around $9.00 per share. Near the close of trading on May 3, 2007, information concerning the May 4, 2007 announcement must have leaked into the market as reflected by the stock's sharp decline near the end of the trading day. Indeed, the Company's stock closed at $8.54 per share or down 8.5% on nearly double the previous day trading volume.

40.    On May 4, 2007 the Company's stock continued to fall. The Company's stock opened down at $8.44 a share and closed the day at $7.90 a share or down an additional 7.5% from May 3, 2007.

## DEFENDANTS CAUSED PLAINTIFFS' LOSSES

41.    During the Class Period, Defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated Inphonic's share price and operated as a fraud or deceit on purchasers of Inphonic shares by misrepresenting the Company's financial condition and business prospects. Once Defendants' misrepresentations and fraudulent conduct were disclosed to the market, Inphonic's share price reacted negatively as the artificial inflation was removed from its share price. As a result of their purchases of Inphonic's shares during the Class Period, Plaintiff and other members of the Class suffered economic loss.

42.     During the Class Period, Defendants' false and misleading statements had the intended effect and caused Inphonic shares to trade at artificially inflated levels throughout the Class Period.

43.     As investors and the market became aware of Inphonic's prior misstatements and omissions and that Inphonic's actual financial condition and business prospects were, in fact, not as represented, Inphonic's share price reacted negatively, damaging investors.

44.     Had Plaintiff and investors known the truth behind the Company's disclosures they would not have purchased the Company's shares or at the inflated prices that they did.

## VIOLATIONS OF GAAP

45.     Additionally, the Company failed to file financial statements with the SEC which conformed to the requirements of GAAP, such that the financial statements were presumptively misleading and inaccurate.

46.     As a result of the Company's accounting improprieties, the Company's reported financial results also violated the following provision of GAAP, for which each defendant is necessarily responsible:

    a.  The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions;

    b.  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources;

c.   The principle that financial reporting should provide information about how management of an enterprise had discharged its stewardship responsibility to owners for the use of enterprise resources entrusted. To the extent management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities to prospective investors to the public in general;

d.   The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance;

e.   The principle that financial reporting should be reliable in that it represents what it purports to represent.

f.   That information should be reliable as well as relevant to a notion that is central to accounting;

g.   The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions; and

h.   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.

20

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

47.    At all relevant times, the market for Inphonic's common stock was an efficient

market for the following reasons, among others.

(a)    Inphonic's stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market;

(b)    During the Class Period, on average, hundreds of thousands of shares of

Inphonic stock were traded on a weekly basis, demonstrating a very active and

broad market for Inphonic stock and permitting a *very strong* presumption of an

efficient market;

(c)    As a regulated issuer, Inphonic filed periodic public reports with the SEC

and the NASDAQ;

(d)    Inphonic regularly communicated with public investors via established

market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major

newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar

reporting services;

(e)    Inphonic was followed by several securities analysts employed by

major brokerage firms who wrote reports which were distributed to

the sales force and certain customers of their respective brokerage

firms during the Class Period. Each of these reports was publicly

available and entered the public marketplace;

21

(f)    Numerous NASD member firms were active market-makers in Inphonic stock at all times during the Class Period; and

(g)    Unexpected material news about Inphonic was rapidly reflected and incorporated into the Company's stock price during the Class Period.

48.    As a result of the foregoing, the market for Inphonic's shares promptly digested current information regarding Inphonic from all publicly available sources and reflected such information in Inphonic's stock price. Under these circumstances, all purchasers of Inphonic's shares during the Class Period suffered similar injury through their purchase of Inphonic's shares at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

49.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Inphonic who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

50.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Inphonic's shares at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

52.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Inphonic's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Inphonic as specified herein.

23

54.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Inphonic's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Inphonic and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Inphonic's shares during the Class Period.

55.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

56.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

24

ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Inphonic's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its shares. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Inphonic's shares were artificially inflated during the Class Period. In ignorance of the fact that market prices of Inphonic's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Inphonic shares during the Class Period at artificially high prices and were or will be damaged thereby.

58.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Inphonic's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have

25

purchased or otherwise acquired their Inphonic shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

61.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of Inphonic within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had

unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65.    As set forth above, Inphonic and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

66.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

67.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

27

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 7, 2007

Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Steven J. Toll, USDC-DC Bar # 225623
Elizabeth S. Finberg, USDC-DC Bar # 468555
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C.  20005-3964
Phone:  (202) 408-4600
Fax: (202) 408-4699

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence Rosen, Esq.
350 Fifth Avenue, Suite 5508
New York, NY  10118
Phone: (212) 686-1060
Fax: (212) 202-3827

*Counsel for Plaintiff*

28

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Inphonic, Inc., its current and former officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the complaint against Inphonic, Inc. and certain of its officers and directors and affiliated parties and authorized the filing thereof by the Rosen Law Firm, P.A., whom I retain as counsel in this action for all purposes.

2.    I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    The following is a list of all of the purchases and sales I have made in Inphonic, Inc. securities. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 3000 | 10/26/2006 | $ 9.49 | | $ |
| 2500 | 10/30/2006 | $ 9.33 | | $ |
| 2500 | 10/31/2006 | $ 9.17 | | $ |
| 1000 | 10/27/2006 | $ 9.50 | | $ |
| 1000 | 10/30/2006 | $ 9.36 | | $ |
| 667 | 10/31/2006 | $9.12 | | $ |
| 1166 | 10/31/2006 | $9.19 | | $ |
| | | $ | | $ |
| 667 | | $ | 10/31/2006 | $9.12 |
| 1166 | | $ | 10/31/2006 | $9.19 |
| 1000 | | $ | 10/27/2006 | $9.50 |
| 1000 | | $ | 10/30/2006 | $9.36 |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM:  (212) 202-3827

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___/___ day of ___MAY___, 2007.

Signature: _____
Name:    Mark Miller
Address: 3810 Vair Street, Durham, NC 27703

Phone:
E-mail:

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR MAIL TO:
THE ROSEN LAW FIRM PA
350 FIFTH AVENUE, SUITE 5508
NEW YORK, NY   10118

2

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Mark Miller, 3810 Vair Street, Durham, North Carolina 27703 Individually and on behalf of all others similarly situated, | Vonage, Inc. 1010 Wisconsin Avenue, Suite 600 Washington, D.C. 20007, David A. Steinberg and Lawrence Winkler 1010 Wisconsin Avenue, Suite 600 Washington, D.C. 20007 |

| **(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**   Durham | **COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**   Washington |
|---|---|
| **(EXCEPT IN U.S. PLAINTIFF CASES)** | **(IN U.S. PLAINTIFF CASES ONLY)** NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Steven J. Toll Cohen, Milstein, Hausfeld & Toll, P.L.L.C. 1100 New York Avenue, N.W. Suite 500, West Tower Washington, D.C.  20005 (202) 408-4600 | |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ● 4 |
| Citizen of Another State | ● 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| ○ **A.** *Antitrust* | ○ **B.** *Personal Injury/ Malpractice* | ○ **C.** *Administrative Agency Review* | ○ **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act <br> **Social Security:** ☐ 861 HIA ((1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g) **Other Statutes** ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. <br> *(If Antitrust, then A governs)* |

| ○ **E.** *General Civil (Other)*   **OR**   ○ **F.** *Pro Se General Civil* | | | |
|---|---|---|---|
| **Real Property** ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent, Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property <br> **Personal Property** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | **Bankruptcy** ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 <br> **Prisoner Petitions** ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition <br> **Property Rights** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark <br> **Federal Tax Suits** ☐ 870 Taxes (US plaintiff or defendant ☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty** ☐ 610 Agriculture ☐ 620 Other Food &Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 RR & Truck ☐ 650 Airline Regs ☐ 660 Occupational Safety/Health ☐ 690 Other <br> **Other Statutes** ☐ 400 State Reapportionment ☐ 430 Banks & Banking ☐ 450 Commerce/ICC Rates/etc. ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Satellite TV ☐ 810 Selective Service ☒ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 900 Appeal of fee determination under equal access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities- Employment ☐ 446 Americans w/Disabilities- Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Violations of the Securities and Exchange Act of 1934, 15 U.S.C. 78j(b) and 78t(a).

**VII. REQUESTED IN COMPLAINT**  ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** to be determined   Check YES only if demanded in complaint   **JURY DEMAND:** YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  5/7/07   SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.